UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUKE HOFFMAN<br><br>Defendant. | Case No. 23-cr-329 (RDM) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Luke Hoffman, to 51 months of imprisonment (in the middle of Hoffman's advisory Guidelines range of 46 to 57 months), three years of supervised release, restitution of $2,000, and a mandatory special assessment of $200.

## I. INTRODUCTION

The defendant, Luke Hoffman, a 40-year-old owner of a maintenance-services company, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim

Hoffman participated in the violence on the Capitol's West Plaza, assaulted two Metropolitan Police Department officers, and helped other rioters at the mouth of the Lower West Terrace entrance, known as the "Tunnel." Hoffman first confronted officers outside the Capitol who were trying to protect the building from rioters and interfered with their efforts by pulling a bike rack fence away from them. He then went on to assault MPD Officer Ca. W. by grabbing his baton while screaming "What's up! This is our house!" Once the police line broke, Hoffman moved forward and sprayed OC spray at MPD Officer Ch. W. Hoffman then spent more than 20 minutes at the mouth of the Tunnel, aiding other rioters who were assaulting police officers and goading on the mob.

Hoffman pleaded guilty to: (1) Count Three, a violation of 18 U.S.C. § 111(a)(1); and (2) a lesser included offense of Count Four, that is, a violation of 18 U.S.C. § 111(a)(1) with an agreement to apply the sentencing enhancement in U.S.S.G. § 2A2.2(b)(2)(B) for use of a dangerous weapon. The government recommends that the Court sentence Hoffman to 51 months of incarceration for his two convictions under 18 U.S.C. § 111(a)(1). A 51-month sentence reflects the gravity of Hoffman's conduct, but also acknowledges his early admission of guilt.

## II. FACTUAL BACKGROUND

### A. The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 22, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

---

officers, the government has sought restitution based on a case-by-case evaluation.

B.     Hoffman's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, the defendant, Luke Hoffman, drove with his wife from his home in Kentucky to Washington D.C. to attend former president Trump's rally at the ellipse. On January 6, he wore a black hooded sweatshirt, a black hooded jacket, a coyote-tan tactical vest, and a pair of dark-colored gloves with white lines. *See Image 1*. He brought with him a can of OC-based spray and a small knife. Hoffman and his wife attended the rally and then marched to the Capitol.



*Image 1: A post from the social media website Parler shows Hoffman in the vest and sweatshirt he wore at the Capitol on January 6.*

At approximately 1:25 p.m., Hoffman positioned himself amid a raucous crowd of rioters on the West Plaza of the U.S. Capitol building. There, he joined the mob in confronting police officers who were attempting to maintain a defensive perimeter between the rioters and the Capitol building.

Hoffman, who had moved to the front of that mob, verbally berated the officers manning the line. When those officers attempted to move a segment of metal fencing between themselves

and the mob, Hoffman reacted aggressively. He lunged forward, grabbed the fence segment, and yanked it away from the officers. *See Images 2 and 3*.



*Images 2 and 3: Screenshots from Sentencing Exhibit 1 at 0:09 and 0:12 showing Hoffman pulling the bike rack fence away from police officers.*

About an hour later, at 2:28 p.m., in nearly the same location, the mob had grown in size and intensity. As rioters began to overrun the group of officers who were still trying to defend the West Plaza, the police lines gave way. In the throes of this chaotic moment, Hoffman attacked Metropolitan Police Officer Ca. W.

As Officer Ca. W. stood in line with other officers attempting to keep the rioters at bay, Hoffman sprang out of the mob, screaming, "What's up! This is our house!" He moved toward Officer Ca. W., who held his baton chest-high in a defensive posture. Hoffman grabbed the baton with both hands and tried to pull it away from the officer while continuing to scream. *See Images 4 and 5*.



*Image 4: A screenshot from Sentencing Exhibit 2, Officer Ca. W.'s body-worn camera, at 0:16, shows Hoffman as he attacks the police officer and grabs his baton.*



*Image 5: A screenshot from an open-source video shows Hoffman as he attacks Officer Ca. W.*

Although Officer Ca. W. retained the baton, the police line was forced back and Hoffman and the rest of the mob marched forward toward the Capitol building.

Minutes later, at approximately 2:30 p.m., with officers now backed into the southern portion of the West Plaza and surrounded by the mob, Hoffman again joined the mob's attack.

Metropolitan Police Officer Ch. W., who stood at the front of that group of officers, attempted to disperse the mob by spraying some particularly aggressive rioters with OC spray. In

response, Hoffman stepped forward from the mob toward Officer Ch. W., extended his right arm, and fired a burst of OC-based spray at the officer. Officer Ch. W. ducked to try to avoid the spray. Hoffman then retreated back into the mob. *See Images 6 and 7.*[2]

 

*Images 6 and 7: Screenshots from Sentencing Exhibit 3, a police officer's body-worn camera, at 0:10, shows Hoffman (circled in yellow) as he raises the can of OC spray and sprays it toward Officer Ch. W. (foreground).*

After attacking Officer Ch. W., Hoffman advanced closer to the Capitol, up to the Lower West Terrace. There, he proceeded all the way to the Lower West Terrace entrance, known as "the Tunnel," where some of the most violent attacks against police officers occurred on January 6. For more than twenty minutes, beginning at approximately 3:43 p.m., Hoffman stood at the threshold of the Tunnel's entrance, surrounded by a mob of violent rioters. *See Image 8.*

---

[2] During his post-plea proffer interview, Hoffman said that he lost the can of pepper spray he brought with him to the Capitol. He picked up a different can of spray, which he used to spray at Officer Ch. W.



*Image 8: A screenshot from Capitol CCTV shows Hoffman in the dense mob at the threshold of the Tunnel's entrance.*

While he stood at the mouth of the Tunnel, Hoffman supported other rioters as they attacked the police officers inside. At one point, another rioter, clad in body armor and a helmet, climbed on top of Hoffman and several other rioters. As the armored rioter knelt on Hoffman's shoulders, he used his elevated position to attack the officers inside the Tunnel with a wooden pole. *See Image 9.*



*Image 9. A screenshot from Sentencing Exhibit 4, an open-source video, shows Hoffman (circled in yellow) as he supports another rioter who is in the midst of attacking officers inside the Tunnel.*

Hoffman also goaded the mob around him outside the Tunnel, waving his hand overhead, encouraging the mob to press further. Finally, at approximately 4:05 p.m., Hoffman left the area outside the Tunnel.

*Defendant's Interview*

On August 27, 2024, Hoffman interviewed with the FBI. He said that he came to the Capitol to voice his disagreement with COVID restrictions. He admitted to bringing a knife and a can of pepper spray with him. He also expressed remorse for his actions and said he wished he had not gone to the Capitol on January 6.

### III.   THE CHARGES AND PLEA AGREEMENT

On September 13, 2023, a federal grand jury returned an indictment charging Hoffman with ten counts, including violations of: 18 U.S.C. § 231(a)(3) (Civil Disorder) (Counts One and Two); 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers) (Count Three); 18 U.S.C. §§ 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon) (Count Four); 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) (Count Five); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) (Count Six); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon) (Count Seven); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) (Count Eight); 40 U.S.C. § 5104(e)(2)(E) (Impeding Passage Through the Capitol Grounds or Buildings) (Count Nine); 40 U.S.C. § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or Buildings) (Count Ten).

On April 4, 2024, Hoffman was convicted of Count Three and a lesser-included offense of

Count Four based on a guilty plea entered pursuant to a plea agreement.

## IV.  STATUTORY PENALTIES

Hoffman now faces sentencing on two counts of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting, or Impeding Certain Officers) (Counts Three and Four). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces the following punishment for each Count of conviction: up to eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Guidelines analysis in the PSR. PSR ¶¶ 38-61. That Guidelines analysis follows:

Count Three: 18 U.S.C. § 111(a)(1):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Total | 20 |

Count Four: 18 U.S.C. § 111(a)(1):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | Total | 24 |

After grouping pursuant to U.S.S.G. §§ 3D1.2 and 3D1.4      +2
    Combined Offense Level                                   26

9

| | |
|---|---:|
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **23** |

*See* Plea Agreement at ¶¶ 5(A).

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. As the parties agreed in the plea agreement, (*see* Doc. 21 at 4), § 4C1.1 does not apply in this case because Hoffman received criminal history points as described in USSG § 4C1.1(a)(1) and because Hoffman used violence or credible threats of violence in connection with the offense as described in USSG § 4C1.1(a)(3).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 68. Accordingly, based on the parties' calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 23, Hoffman's Guidelines imprisonment range is 46 to 57 months' imprisonment. The defendant's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

VI. **SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

A. **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Hoffman's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Hoffman participated in some of the worst violence that took

place that day, assaulting multiple police officers and interfering with their efforts to protect the Capitol over an extended period of multiple hours. The nature and circumstances of Hoffman's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 51 months of incarceration.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Hoffman's criminal history consists of the following convictions:

- In 2005, Hoffman was charged with forgery, second degree. He received a sentence of 2 years of diversion (6 months supervised; remainder unsupervised). According to the PSR, he falsely made, completed, or altered a credit card voucher payable to Beyond Fitness in the amount of $279. PSR ¶ 65.

- In 2010, Hoffman was charged with leaving the scene of an accident. He received a sentence of 30 hours of community service, and fines and costs. PSR ¶ 66.

- In 2011, Hoffman was charged with No Operator's License in Possession and possession of marijuana. He was sentenced to pay $100 in costs and was ordered to complete a driver's education program. According to the PSR, a police officer conducted a traffic stop of a vehicle Hoffman was driving. Hoffman was found to have a suspended license in the state of Kentucky and the officer discovered a small bag of marijuana inside the vehicle. Hoffman received one criminal history point for this sentence. PSR ¶ 67.

Hoffman also has several juvenile adjudications, all of which occurred in 2000 or earlier. PSR ¶¶ 62-64.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Hoffman's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[3] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, although the defendant has a criminal history category of I, his history of arrest and conviction shows a clear pattern of criminal behavior. *See* Section VI(B) *supra.* Second, although the defendant has now expressed remorse and contrition, his violent actions, sustained over a relatively long period of time given the circumstances on the West Plaza on January 6, show a level of aggression that is uncommon even for that day, and must be deterred.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by

---

[3] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have

13

sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[4] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[5] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The case of *United States v. Douglas Wyatt*, 23-CR-215 (RDM) is strikingly similar to this one. In that case, this Court sentenced the defendant to 46 months of incarceration. Wyatt pleaded guilty to a single charge of 18 U.S.C. § 111(b), but his ultimate offense level was 23, which is the same as Hoffman's. Wyatt, like Hoffman, spent a considerable amount of time on the West Plaza. In fact, they were both in nearly the same location at the same time—the northwest corner of the West Plaza before the police lines broke at 2:28 p.m. There, both Wyatt and Hoffman watched

---

[4] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

violence against officers including people throwing objects like chairs and poles. Both of them yanked a bike rack barrier away from police officers, both of them berated officers, and both of them advanced across the West Plaza once police lines broke. Hoffman attacked one police officer with his hands and another with OC spray, while Wyatt found a MPD duffle bag and stole a sprayer from it, which he used against officers. Both Hoffman and Wyatt ascended to the Lower West Terrace after their assaults on officers. While Wyatt sat on the ledge of the stage for over an hour watching the chaos, Hoffman went directly to the mouth of the Tunnel and helped propagate violence there. Hoffman's continued aggression for a longer period of time makes the 51-month sentence appropriate here.

The case of *United States v. Lucas Denney*, 22-CR-070 (RDM), also presents similar facts. In that case, this Court sentenced the defendant to 52 months of incarceration following a plea to § 111(b). Denney, a former military police officer and the self-declared President of a militia group called the Patriot Boys of North Texas, gathered protective gear and weapons, recruited others, and traveled to Washington, D.C. anticipating violence on January 6. Like Hoffman, Denney confronted Officers on the west side of the Capitol. Denney joined the storming of the police lines on the West Plaza and Northwest Staircase, deployed pepper spray in the direction of officers, assaulted them, and attempted to disarm them, as did Hoffman. Denney then made his way to the Lower West Terrace brandishing a baton or a stick and joined in the mob's efforts to push their way through a line of police officers, including by pushing a riot shield into the officers, and shortly thereafter, swung at a police officer who had been separated from the police line. Hoffman also went to the Tunnel. Later, Denney entered the Tunnel where he joined other rioters in "heave ho" efforts to enter the building, pushed a riot shield into a line of officers, and swung his fist at an

violence against officers including people throwing objects like chairs and poles. Both of them yanked a bike rack barrier away from police officers, both of them berated officers, and both of them advanced across the West Plaza once police lines broke. Hoffman attacked one police officer with his hands and another with OC spray, while Wyatt found a MPD duffle bag and stole a sprayer from it, which he used against officers. Both Hoffman and Wyatt ascended to the Lower West Terrace after their assaults on officers. While Wyatt sat on the ledge of the stage for over an hour watching the chaos, Hoffman went directly to the mouth of the Tunnel and helped propagate violence there. Hoffman's continued aggression for a longer period of time makes the 51-month sentence appropriate here.

The case of *United States v. Lucas Denney*, 22-CR-070 (RDM), also presents similar facts. In that case, this Court sentenced the defendant to 52 months of incarceration following a plea to § 111(b). Denney, a former military police officer and the self-declared President of a militia group called the Patriot Boys of North Texas, gathered protective gear and weapons, recruited others, and traveled to Washington, D.C. anticipating violence on January 6. Like Hoffman, Denney confronted Officers on the west side of the Capitol. Denney joined the storming of the police lines on the West Plaza and Northwest Staircase, deployed pepper spray in the direction of officers, assaulted them, and attempted to disarm them, as did Hoffman. Denney then made his way to the Lower West Terrace brandishing a baton or a stick and joined in the mob's efforts to push their way through a line of police officers, including by pushing a riot shield into the officers, and shortly thereafter, swung at a police officer who had been separated from the police line. Hoffman also went to the Tunnel. Later, Denney entered the Tunnel where he joined other rioters in "heave ho" efforts to enter the building, pushed a riot shield into a line of officers, and swung his fist at an

officer who other rioters had pulled out of the Tunnel. After January 6, Denney lied to FBI agents about his knowledge of the assault and deleted information from a social media account.

In *United States v. Jorden Mink*, 21-CR-025 (RDM), the defendant also pleaded guilty to a violation of 18 U.S.C. § 111(a), as well as theft of government property in violation of 18 U.S.C. § 641. Mink joined the riotous crowd near the Tunnel, then climbed onto an exterior window ledge of the Capitol building armed with a baseball bat. Mink repeatedly struck a window with the bat, causing it to shatter, then entered the Capitol through the window and removed chairs, which he handed to other rioters. He then assaulted police officers in the Lower West Terrace by spitting on them, throwing items at them, and repeatedly striking them with a flagpole. This Court sentenced Mink to 51 months of incarceration.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Officers Ca. W. and Ch. W., did not suffer bodily injury as a result of Hoffman's assaults. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Hoffman must pay $2,000 in restitution, which reflects in part the role Hoffman played in the riot on January 6.[7] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Hoffman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 139.

## VIII. FINE

The defendant's convictions for two violations of 18 U.S.C. § 111(a)(1) subject him to a statutory maximum fine of $250,000 on Count One and $250,000 on Count Two. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.

---

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

### IX. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 51 months of imprisonment, at the midpoint of Hoffman's advisory Guidelines range, three years of supervised release, restitution of $2,000, and a mandatory special assessment of $200.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/ *Eric W. Boylan*
Eric W. Boylan
Assistant U.S. Attorney
Texas Bar No. 24105519
Phone: 202-815-8608
Email: Eric.Boylan@usdoj.gov
601 D Street NW
Washington, D.C. 20001